## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **VIOLET DENISE GARRETT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:18-cv-00304-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Violet Denise Garrett seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Ms. Garrett's claims for disability insurance benefits and supplemental security income.  After careful review, the Court affirms the Commissioner's decision.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the proper defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## I.     PROCEDURAL HISTORY

Ms. Garrett applied for disability insurance benefits and supplemental security income.  (Doc. 6-4, pp. 2, 20).  Ms. Garrett alleges that her disability began on March 20, 2012.  (Doc. 6-7, p. 39; Doc. 6-3, p. 44).  The Commissioner initially denied Ms. Garrett's claims.  (Doc. 6-4, pp. 2, 20).  Ms. Garret requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 6-5, p. 2).  The ALJ issued an unfavorable decision.  (Doc. 6-4, pp. 41-49).

Ms. Garrett filed an administrative appeal.  (Doc. 6-6, p. 29, 31-32).  The Appeals Council vacated the ALJ's decision and remanded Ms. Garrett's claims for further review.  (Doc. 6-4, pp. 56-57).  Following the Appeals Council's remand, a new ALJ held a supplemental hearing. (Doc. 6-3, p. 39).  This ALJ issued an unfavorable decision.  (Doc. 6-3, pp. 16-28).  The Appeals Council declined Ms. Garrett's request for review, making the Commissioner's decision final for this Court's judicial review.  (Doc. 6-3, p. 2).  *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ determined that Ms. Garrett meets the Social Security Act's insured status requirements through March 31, 2013. (Doc. 6-3, p. 18). The ALJ found that Ms. Garrett has not engaged in substantial gainful activity since the alleged onset date of March 30, 2012. (Doc. 6-3, p. 18). The ALJ determined that Ms. Garrett suffers from the following severe impairments: osteoarthritis, bilateral foot pain, and mild degenerative joint disease. (Doc. 6-3, p. 18). The ALJ determined that Ms. Garrett suffers from the non-severe impairments of bilateral carpal tunnel syndrome, migraines, obesity, and major depressive disorder. (Doc. 6-3, pp. 19-22). Based on a review of the medical evidence, the ALJ concluded that Ms. Garrett does not have an impairment or combination of impairments that meets or medically

equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 23).

In light of Ms. Garrett's impairments, the ALJ evaluated her residual functional capacity. The ALJ determined that Ms. Garrett has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she can occasionally balance, stoop, and climb ramps and stairs; but never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. (Doc. 6-3, p. 23). "Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a). The ALJ found that Ms. Garrett can constantly handle, reach, finger, and feel but should avoid concentrated exposure to extreme heat and cold, humidity, wetness, and vibrations. (Doc. 6-3, p. 23). Based on this RFC, the ALJ concluded that Ms. Garett is unable to perform her past relevant work as a childcare worker, windshield inspector, cook, or home aide. (Doc. 6-3, p. 26). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Ms. Garrett can perform, including general office clerk, order

clerk, receptionist, and information clerk.  (Doc. 6-3, pp. 27-28).  Accordingly, the ALJ determined that Ms. Garrett has not been under a disability within the meaning of the Social Security Act.  (Doc. 6-3, p. 28).

## IV.  ANALYSIS

Ms. Garrett contends that she is entitled to relief from the ALJ's decision because the ALJ evaluated several medical opinions improperly.  (Doc. 8, pp. 6, 10).  After considering the record as a whole, the Court affirms the ALJ's decision.

### *Dr. Howard's Opinion*

Ms. Garrett maintains that the ALJ should have accepted the physical capacities opinion of Dr. Howard, Ms. Garrett's treating doctor.  (Doc. 6-15, pp. 2, 57).  "Absent 'good cause,' an ALJ is to give the medical opinions of treating physicians 'substantial or considerable weight.'"  *Winschel*, 631 F.3d at 1179 (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  When declining to give a treating physician's opinion considerable weight, an ALJ must clearly articulate the reasons for her decision.  *Winschel*, 631 F.3d at 1179.  Good cause exists when:

> (1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.

*Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004); *Lustgarten v. Comm'r of Soc. Sec.*, No. 17-14763, 2019 WL 6048534, at *2 (11th Cir. Nov. 15, 2019) (quoting *Phillips* for good cause framework).

The ALJ assigned minimal weight to Dr. Howard's opinion. (Doc. 6-3, p. 26). The ALJ found that Dr. Howard's functional assessment lacked support "in his own treatment records, the other medical evidence of record, [and Ms. Garrett's] admitted daily activities." (Doc. 6-3, p. 26). The ALJ reasoned that Dr. Howard's "records do not contain evidence of the claimant having substantial restrictions in walking, standing, or sitting, or that the claimant experiences significant side effects from her prescribed medication." (Doc. 6-3, p. 26). The ALJ found that the absence of "substantial changes to [Ms. Garrett's] pain management medication" undermined Dr. Howard's opinion. (Doc. 6-3, p. 26). The ALJ pointed out that prior treatment records showed that Ms. Garrett had a normal gait. (Doc. 6-3, p. 26). To determine whether the ALJ has demonstrated good cause, the Court begins with a review of Dr. Howard's treatment records.

Ms. Garrett visited Dr. Howard in August 2014 and complained of migraine headaches and chronic back pain. (Doc. 6-15, p. 57).[2] According to Dr. Howard's notes, Ms. Garrett's back pain began after "[s]he had extensive surgery on [her] right

---

[2] Dr. Howard's notes from the August 2014 visit do not classify Ms. Garrett as a new patient, but these are the earliest treatment documents from Dr. Howard in the record. (Doc. 6-15, p. 57).

foot which altered her gait."  (Doc. 6-15, p. 57).  Ms. Garrett told Dr. Howard that she could not "deal with [her back pain] through the day" and that it was "worse at night."  (Doc. 6-15, p. 58).

Ms. Garrett reported undergoing an orthopedic evaluation "which was essentially negative."  (Doc. 6-15, p. 57).  Ms. Garrett told Dr. Howard that she had been through "extensive physical therapy," but she still had "a lot of discomfort." (Doc. 6-15, p. 57).

Ms. Garrett reported having prescriptions for Norco (one 7.5-325 mg tablet every 12 hours) and Ultram (two 50 mg tablets every eight hours) for pain.  (Doc. 6-15, p. 57).[3]  Ms. Garrett told Dr. Howard that she had taken "multiple types of opioids in the past, but all of these made her feel bad." (Doc. 6-15, p. 57).  Ms. Garrett told Dr. Howard that because of those negative side effects, "she does not take [opioids] very often."  (Doc. 6-15, p. 57).

Ms. Garrett reported taking "Aleve intermittently for this pain."  (Doc. 6-15, p. 57).  According to Ms. Garrett, she suffers from migraines, but "Topamax has been very effective" in treating this condition.  (Doc. 6-15, p. 57).

Dr. Howard provided the following assessments relevant to Ms. Garrett's appeal:

---

[3] Norco is a combination medication used to treat moderate to severe pain.  "7.5-325 mg" means it contains the opioid hydrocodone in a dose of 7.5 mg and acetaminophen in a dose of 325 mg. https://www.rxlist.com/norco-5-325-drug.htm#indications (last visited Dec. 5, 2019).

1. Chronic pain management. The patient only takes hydrocodone every other day, but I am concerned about escalating need for this medication due to use I have asked her to try Mobic intermittently. I have also given her trigger-point injection x3 of DKL into the right gluteal piriformis musculature. This is secondary to spasm. The patient does have a muscle prominence on the right gluteal piriformis musculature with significant tender points. Trigger points are injected at 2-cm intervals; 3 injections were given. Family support is excellent. She is married. Her relationship is very stable at this time. Psychological state is excellent. She is doing very well at this point. Mental status is good. She has no evidence of depression at this point. Diagnosis is myofascial back pain aggravated by mild scoliosis with unstable gait. Orthopedic evaluation has been completed. Pain options are physical therapy, which will be initiated. She has undergone physical therapy in the past, but I do not feel that she has continued physical therapy on a daily basis at home. I would like to institute DS form [of] treatment. The patient has been transiently on medications to include hydrocodone, one every other day, as well as Ultram intermittently. I feel comfortable with Ultram but would like her to continue to limit the hydrocodone. Continue the gabapentin at night, which has been very effective for her. I would like her to hold the Zocor, as this may well cause myofascial pain that would mimic underlying pathology. Epidural is a consideration at later date. Next visit, consider physical therapy. Lidoderm patch is added, as well as a prescription for Norco 7.5 mg, #30 tablets, 0 refills.
2. Migraine headaches, on Topamax, doing extremely well at this time. She has been on this for many years.

(Doc. 6-15, p. 58).

Ms. Garrett returned to Dr. Howard in October 2014. (Doc. 6-15, p. 55). Ms. Garrett complained of migraines, and Dr. Howard noted that the cause was unclear. (Doc. 6-15, p. 55). Dr. Howard recommended that Ms. Garrett continue prophylaxis and start zonisamide for migraine treatment. (Doc. 6-15, p. 55). Dr. Howard

believed that Ms. Garrett's migraines were "probably secondary" to untreated sleep apnea, "with CPAP inaccessible due to expense." (Doc. 6-15, pp. 55-56, 55).

Dr. Howard assessed Ms. Garrett's pain as "class B secondary to [degenerative joint disease] of the knees with foot and hip pain." (Doc. 6-15, p. 55). Dr. Howard noted that Ms. Garrett "shows functional improvement with medication." (Doc. 6-16, p. 55). Dr. Howard started Ms. Garrett on Celexa (two 10 mg tablets daily) to treat depressive disorder. (Doc. 6-15, p. 56).

During an early December 2014 visit to Dr. Howard, Ms. Garrett complained of anxiety and depression that began after someone killed her aunt in November. (Doc. 6-15, p. 52). Dr. Howard did not adjust Ms. Garrett's Celexa, Norco, or Ultram prescriptions. (Doc. 6-15, p. 52). Consistent with Dr. Howard's recommendation during Ms. Garrett's prior visit, Ms. Garrett was taking Mobic (one 15 mg tablet daily) for pain. (Doc. 6-15, p. 55).

Dr. Howard noticed no change in Ms. Garrett's degenerative arthritis, and Ms. Garrett denied gait abnormality during this December visit. (Doc. 6-15, pp. 53, 54). Dr. Howard noted that Ms. Garrett's carpal tunnel syndrome and migraines were stable. (Doc. 6-15, p. 53). Concerning chronic pain, Dr. Howard reported that Ms. Garrett's "functional status has improved with medication." (Doc. 6-15, p. 53).

In mid-December 2014, Ms. Garrett complained of bilateral foot pain and leg cramping after exertion. (Doc. 6-15, pp. 49, 50). Dr. Howard noted that Ms.

Garrett's degenerative arthritis and headaches remained stable. (Doc. 6-15, p. 50). Ms. Garrett denied gait abnormality. (Doc. 6-15, p. 51). Dr. Howard did not modify Ms. Garrett's Celexa, doxepin, Norco, Ultram, or Mobic prescriptions. (Doc. 6-15, p. 49). Dr. Howard noted that Ms. Garrett was taking doxepin (one or two 10 mg capsules nightly) for depression. (Doc. 6-15, p. 49).[4]

Dr. Howard decided to order EMG and nerve conduction studies to determine whether Ms. Garrett had carpal tunnel syndrome. (Doc. 6-15, p. 50). Despite noting Ms. Garrett's attention deficit disorder "with underlying [f]atigue and [d]epression[,]" Dr. Howard reported that Ms. Garrett's "[m]ood and outlook [were] good." (Doc. 6-15, p. 50). According to another section of the treatment notes from that same visit, Ms. Garrett reported having anxiety, but denied depression. (Doc. 6-15, p. 51).

During a March 2015 visit with Dr. Howard, Ms. Garrett complained of chronic right foot pain and bunions. (Doc. 6-15, pp. 46, 47). Overall, Ms. Garrett reported "feeling fairly well." (Doc. 6-15, p. 46). By then Dr. Howard had diagnosed Ms. Garrett with carpal tunnel syndrome and recommended stretching exercises and weight lifting to address the condition. (Doc. 6-15, p. 47). Ms. Garrett denied joint stiffness, muscle aching and weakness, leg cramping, gait abnormality,

---

[4] Doxepin "is used to treat symptoms of depression and/or anxiety associated with alcoholism, psychiatric conditions, or manic-depressive conditions." https://www.drugs.com/mtm/doxepin-sinequan.html (last visited Dec. 5, 2019).

anxiety, and depression. (Doc. 6-15, p. 48). According to Dr. Howard's notes, Ms. Garrett's "[m]ood [was] good" and her "[o]utlook . . . positive." (Doc. 6-15, p. 47).

Dr. Howard noted a decision to "increase" Ms. Garrett's Norco medication. (Doc. 6-15, p. 47). But Dr. Howard recorded the same dose (7.5-325 mg) and decreased the frequency of dosage to one-half tablet every 12 hours. (Doc. 6-15, p. 47). Dr. Howard did not adjust Ms. Garrett's Celexa, Mobic, or doxepin prescriptions. (Doc. 6-15, p. 46). At this time, Ms. Garret was no longer using Ultram for pain. (Doc. 6-15, p. 46).

Ms. Garrett visited Dr. Howard in April 2015 and complained of bilateral foot pain. (Doc. 6-15, p. 44). Ms. Garrett reported that her "right bones fe[lt] like they [were] rubbing/grinding against each other." (Doc. 6-15, p. 44). According to Dr. Howard's notes, Ms. Garrett denied joint stiffness, muscle aching and weakness, decreased sensation in extremities, leg cramping, gait abnormality, anxiety, and depression. (Doc. 6-15, p. 45). Additionally, Ms. Garrett's functional status, focus, and concentration had improved. (Doc. 6-15, p. 44). Dr. Howard reviewed the medications list with Ms. Garrett and recorded no changes. (Doc. 6-15, p. 44).

During a June 2015 visit, Ms. Garrett complained of back muscle pain, tightness in her neck, and swelling feet. (Doc. 6-15, pp. 41, 42). According to Dr. Howard's notes, Ms. Garrett's arthritis and migraines were stable and her carpal tunnel syndrome was unchanged. (Doc. 6-15, p. 42). Ms. Garrett had no pain or

swelling in her extremities, and Dr. Howard's general physical examination revealed no changes. (Doc. 6-15, p. 42). Ms. Garrett received steroid injections and a cervical spine x-ray. (Doc. 6-15, pp. 43, 40). The x-ray results showed no evidence of spondylolisthesis. (Doc. 6-15, p. 42). Dr. Howard refilled Ms. Garrett's Celexa and Norco prescriptions without modification. (Doc. 6-15, p. 41).

Ms. Garrett returned to Dr. Howard in September 2015 and complained of her carpal tunnel syndrome "acting up," especially in the left wrist, joint stiffness and soreness, and swelling feet. (Doc. 6-15, p. 38). Ms. Garrett described cramping in her shoulders and back and severe leg cramping. (Doc. 6-15, p. 38). According to Dr. Howard's notes, Ms. Garrett's carpal tunnel syndrome symptoms were "[c]oncomitant issues" unrelated to pain. (Doc. 6-15, p. 39). Ms. Garrett received an injection in her left wrist and tolerated the procedure well. (Doc. 6-15, p. 38). Dr. Howard reported that Ms. Garrett's mood and outlook were stable and that she was attentive. (Doc. 6-15, p. 39). Dr. Howard did not modify Ms. Garrett's Celexa, doxepin, Mobic, or Norco prescriptions. (Doc. 6-15, p. 38).

Dr. Howard's notes from Ms. Garrett's next several visits show that the appointments were primarily for conditions unrelated to her disability claims. (*See* Doc. 6-15, p. 36) (listing cough and congestions as reasons for early November 2015 visit); (Doc. 6-15, pp. 34, 32) (listing thigh abscess as reason for later November 2015 visits); (Doc. 6-15, p. 29) (listing left wrist skin discoloration and breast

tenderness as reasons for January 2016 visit); (Doc. 6-15, p. 27) (listing chest congestion and pain, cough, and sinus as reasons for mid-February 2016 visit); (Doc. 6-15, p. 25) (listing follow up after hospitalization from pneumonia as reason for later February 2016 visit); (Doc. 6-15, p. 23) (listing boil, diet, and left wrist pain (with uncertainty if the pain related to carpal tunnel syndrome) as reasons for late March 2016 visit); (Doc. 6-15, p. 23) (noting that left wrist pain in March 2016 was "consistent with rotator cuff syndrome"); (Doc. 6-15, p. 21) (listing wound check on right underarm as reason for later March 2016 visit); (Doc. 6-15, p. 19) (listing congestion, coughing, and sinus issues as reasons for May 2016 visit); (Doc. 6-15, p. 15) (listing dizziness and feeling slightly off balance as reasons for September 2016 visit).[5]

During an August 2016 visit, Ms. Garrett complained of "right upper arm pain," "tightness and burning[,]" and periodic "neck and shoulder stiffness and pain[.]" (Doc. 6-15, p. 17). Dr. Howard ordered an x-ray and gave Ms. Garrett an injection for her neck and shoulder pain. (Doc. 6-15, p. 18). Dr. Howard did not notice significant arthritis in the x-ray results. (Doc. 6-15, p. 18). Dr. Howard suspected that Ms. Garret might have a rotator cuff injury. (Doc. 6-15, p. 18). Dr.

---

[5] During the February 2016 visit, Dr. Howard started Ms. Garrett on Percocet (one-half to one 10-325 mg tablet every six hours as needed for pain). (Doc. 6-15, p. 23). By then, Ms. Garrett also was taking ibuprofen (one 800 mg tablet three times daily). (Doc. 6-15, p. 23). As of the May 2016 visit with Dr. Howard, Ms. Garrett was not taking Percocet. (Doc. 6-15, p. 19).

Howard refilled Ms. Garrett's ibuprofen prescription. (Doc. 6-15, p. 17). Based on the medication list, Ms. Garrett continued to take Celexa, doxepin, Norco, and Mobic. (Doc. 6-15, p. 17).

In October 2016, Dr. Howard completed a physical capacities evaluation for Ms. Garrett. (Doc. 6-15, p. 61). Dr. Howard marked that Ms. Garret could lift 20 pounds occasionally and 10 pounds frequently. (Doc. 6-15, p. 61). Dr. Howard found that, at the most, Ms. Garrett could sit for two hours and stand/walk one hour during an eight-hour day. (Doc. 6-15, p. 61). Dr. Howard determined that Ms. Garrett could manipulate with her fingers and bend frequently. (Doc. 6-15, p. 61). Dr. Howard limited to occasionally Ms. Garrett's ability to push, pull, climb stairs, grasp, twist, handle, stoop, and reach. (Doc. 6-15, p. 61). Dr. Howard found that Ms. Garrett could operate motor vehicles but not work around hazardous machinery, dust, allergens, and fumes. (Doc. 6-15, p. 61).

Dr. Howard concluded that the extent of Ms. Garrett's pain would "be distracting to adequate performance of daily activities or work." (Doc. 6-15, p. 62). Dr. Howard reported that "physical activity, such as prolonged sitting, walking, standing, bending, stooping, [and] moving of extremities" would "[g]reatly increase[] [Ms. Garrett's] pain" and "cause distraction from tasks or total abandonment of tasks." (Doc. 6-15, p. 62). Dr. Howard expected that the side effects of Ms. Garrett's medications would impact her ability to work severely "due

to distraction, inattention, [and] drowsiness." (Doc. 6-15, p. 63). Dr. Howard did not explain his reasoning for his conclusions or attach any supporting treatment information to his functional assessment.

Dr. Howard's treatment notes do not reference Ms. Garrett's ability to sit and stand, but they do address walking. According to Dr. Howard's notes, Ms. Garrett was having difficulty walking and was feeling unstable in August 2014. (Doc. 6-15, p. 57). Dr. Howard prescribed medications to relieve these symptoms, and from December 2014 to April 2015, Ms. Garrett denied gait abnormality and her functioning improved. (Doc. 6-15, pp. 54, 55, 51, 53, 48, 45); *see Green v. Soc. Sec. Admin.*, 223 Fed. Appx. 915, 922–23 (11th Cir. 2007) (good cause to discount doctor's functional opinion when subsequent treatment records showed the plaintiff was "[d]oing quite well" with her respiratory problem). When Ms. Garrett complained of cramping, stiffening joints, and swelling and painful feet in 2014 and 2015, Dr. Howard did not list difficulties with sitting, standing, or walking as secondary issues. (Doc. 6-15, pp. 38-40, 41-43, 44-45, 46-48, 49-51). Thus, the ALJ's reliance on Dr. Howard's conflicting treatment notes to discount the sitting, standing, and walking limitations satisfies the good cause standard. *See Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (Good cause includes the absence of "clinical data or information to support [an] opinion" and contradictions within the physician's treatment notes.).

Conflicting treatment notes adequately support the ALJ's reasons for discounting Dr. Howard's opinion that side effects severely impact Ms. Garrett's ability to work. During the August 2014 visit, Ms. Garrett told Dr. Howard that she had reduced opioid medications because they caused her to feel bad. (Doc. 6-15, p. 57). But Dr. Howard's treatment records do not show that Ms. Garrett complained of side effects regularly. And Dr. Howard reported that Ms. Garrett's functionality had improved under the medication regimen he recommended. (Doc. 6-16, pp. 55, 53). Dr. Howard did not modify Ms. Garrett's Celexa prescription. While Dr. Howard adjusted Ms. Garrett's chronic pain and migraine medication occasionally, the record supports the ALJ's observation that those modifications were not substantial. (*See* Doc. 6-15, p. 60) (listing Ms. Garrett's medications as of September 2016, including Topamax, Norco, Mobic, doxepin, Celexa, zonisamide, and ibuprofen).

Ms. Garrett testified that her medication caused her to gain weight and lose hair. (Doc. 6-3, p. 97). These certainly are difficult side effects to experience, but the legal standard for evaluating disability asks, "the extent to which [a claimant's] symptoms, such as pain [and side effects], affect [the] capacity to perform basic work activities." 20 C.F.R. § 404.1529(c)(4).

Treatment records from other doctors provide additional reasons to discount Dr. Howard's sitting, walking, and standing limitations. According to the records

from Dr. Boston, a treating orthopedist, Ms. Garrett experienced difficulty walking in 2012.  In August 2012, Ms. Garrett complained of occasional hip pain.  (Doc. 6-10, p. 23).  According to Ms. Garrett, "the onset was gradual without injury and began on 8/15/2012."  (Doc. 6-10, p. 23).  Ms. Garrett told Dr. Boston that "daily activities, sitting, standing and walking" aggravated her pain and that "heat and pain medication" relieved it.  (Doc. 6-10, p. 23).  During that visit, Dr. Boston noted that Ms. Garrett "walk[ed] with a normal gait" and "ha[d] no walking limitation."  (Doc. 6-10, p. 23); (*see also* Doc. 6-10, p. 24) ("The patient walks with a normal, non-antalgic heel to toe gait.").[6]  Dr. Boston gave Ms. Garrett a steroid injection in her right hip.  (Doc. 6-10, p. 25).

When Ms. Garrett returned to Dr. Boston in September 2012, she complained of "[s]harp pain in the right hip" and "[d]ull pain and swelling in the right foot." (Doc. 6-10, p. 27).  Ms. Garrett told Dr. Boston that "the injection did not help." (Doc. 6-10, p. 27).  Ms. Garrett was "walk[ing] with a limp." (Doc. 6-10, p. 27).  Her posture was normal.  (Doc. 6-10, p. 29).  Ms. Garrett rated her hip pain seven out of ten.  (Doc. 6-10, p. 27).

Ms. Garrett described her dull right foot pain as constant with swelling.  (Doc. 6-10, p. 27).  Ms. Garrett rated her foot pain three out of ten.  (Doc. 6-10, p. 27).

---

[6] Antalgic means "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)." https://www.merriam-webster.com/medical/antalgic (last visited Dec. 6, 2019).

According to Ms. Garrett, "[t]he onset was gradual without injury and began on 9/10/2008." (Doc. 6-10, p. 27). Ms. Garrett told Dr. Boston that "daily activities, standing and walking" aggravated her foot pain and that "nothing relieve[d] her symptoms." (Doc. 6-10, p. 27). Ms. Garrett reported that she could "walk about 10 to 20 minutes." (Doc. 6-10, p. 27).

Dr. Boston ordered an x-ray of Ms. Garrett's right foot. (Doc. 6-10, p. 30). Dr. Boston confirmed Ms. Garrett's prior foot surgery and interpreted the test results as unremarkable. (Doc. 6-10, p. 30). Dr. Boston prescribed Ms. Garrett Lyrica for cramping and Naprosyn (one 500 mg tablet twice daily) for pain. (Doc. 6-10, p. 30). Dr. Boston referred Ms. Garrett to "a physical therapy program for her back and hip." (Doc. 6-10, p. 30).

Ms. Garrett saw Dr. Boston in early October 2012 and complained of "sharp pain in the right hip" and occasional "sharp and shooting pain" in her back. (Doc. 6-10, p. 31). She no longer complained of foot pain. (Doc. 6-10, p. 31). Ms. Garrett rated her pain seven out of ten. (Doc. 6-10, p. 31). According to Ms. Garrett, "[t]he onset was sudden without injury and began on 8/15/2012." (Doc. 6-10, p. 31). Ms. Garrett told Dr. Boston that standing, walking, and activity aggravated her symptoms. Ms. Garrett continued to limp and stated that she could "walk about 10 minutes." (Doc. 6-10, p. 31).

Dr. Boston performed straight leg tests, and the results were negative. (Doc. 6-10, p. 34).[7] Dr. Boston reported that x-ray results of Ms. Garrett's lumber spine were unremarkable. (Doc. 6-10, p. 34). Dr. Boston scheduled Ms. Garrett for an MRI of her back. (Doc. 6-10, p. 34).

Ms. Garrett returned to Dr. Boston a few days later for her MRI results. Ms. Garrett rated her pain "6.5 out of 10." (Doc. 6-10, p. 35). During this October visit, Ms. Garrett "walk[ed] with a normal, non-antalgic heel to toe gait." (Doc. 6-10, p. 35). Ms. Garrett's MRI results showed "[n]o evidence of neural impingement." (Doc. 6-10, p. 38). Dr. Boston "dismissed [Ms. Garrett] from follow-up" and told her to "[r]eturn if any problems arise." (Doc. 6-10, p. 38). Dr. Boston remarked that Ms. Garrett was "reassured." (Doc. 6-10, p. 38).

The record does not show that Ms. Garrett returned to Dr. Boston for treatment. Records after 2012 show that Ms. Garrett was physically active. For example, as of January 2013, a treating general physician, Dr. Smith, noted that Ms. Garrett was "[e]xercising regularly." (Doc. 6-14, p. 21). Ms. Garrett did complain of walking difficulties to Dr. Smith in October 2013, but after adjusting Ms. Garrett's medication, Dr. Smith noted no additional complaints of trouble walking from Ms. Garrett. (*See* pp. 24-25 below).

---

[7] Examiners use the straight leg raise test to evaluate patients "with low back pain and nerve pain that radiates down the leg." https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Dec. 6, 2019).

In March 2014, Ms. Garrett received emergency room treatment for an ankle injury that occurred "as a result of orthopedic/sports related activity." (Doc. 6-12, p. 29). Dr. Howard's August 2014 treatment notes state that Ms. Garrett had attended physical therapy in the past and would attend physical therapy in the future to help manage her back pain. (*See* Doc. 6-15, p. 58) ("She has undergone physical therapy in the past, but I do not feel that she has continued physical therapy on a daily basis at home."). Combined, these treatment records show that Ms. Garrett experienced walking, sitting, and standing difficulties in 2012 and 2013 with each separate period lasting approximately three months but not continuously for 12 months. *See* 20 C.F.R. §§ 404.1505(a), 416.905(a) ("The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."); *see also* SSR 82-52, 1982 WL 31376, at *1) ("Severe impairments lasting less than 12 months cannot be combined with successive, unrelated impairments to meet the duration requirement."). Thus, substantial evidence indicates that the ALJ had good cause for assigning minimal weight to Dr. Howard's treating opinion.[8]

---

[8] On this record, the Court does not address whether the ALJ appropriately relied on Ms. Garrett's description of her physical activities to discount Dr. Howard's opinion.

*Dr. Harris's Opinion*

Ms. Garrett challenges the ALJ's discounting of Dr. Harris's opinion. (Doc. 8, p. 8). Dr. Harris is a one-time consulting orthopedic surgeon who examined Ms. Garrett in October 2014. (Doc. 6-14, pp. 67, 68). Dr. Harris noted that x-rays of Ms. Garrett's feet revealed degenerative joint changes. (Doc. 6-14, p. 57). Based on his examination, Dr. Harris found "a full range of motion [in Ms. Garrett's] neck, shoulders, elbows, wrists, and fingers" and no deficiencies in Ms. Garrett's upper extremities. (Doc. 6-14, p. 67). Dr. Harris noted tenderness in Ms. Garrett's lower back with a reduced range of motion. (Doc. 6-14, p. 67). Dr. Harris found that Ms. Garrett had a "full range of motion [in her] hips, knees, and ankles." (Doc. 6-14, p. 67).

Concerning Ms. Garrett's ability to walk and squat, Dr. Harris explained:

Toe extensors are diminished because of difficulty with use of the great toes. There is tenderness to palpation in both feet, worse on the right. Evidence of previous [bunion] surgery right foot. Dorsalis pulses and all peripheral pulses are present and equal bilaterally Sensation is normal in both feet. Toe range of motion is diminished.

The claimant does not toe or heal walk or squat and arise well because of residuals with the right foot.

Gait is normal except for a slight limp favoring the right lower extremity.
. . .

Both knees have full range of motion. There is no instability noted. There is no effusion noted, but tenderness to palpation.

(Doc. 6-14, p. 67). After making these findings, Dr. Harris concluded that Ms. Garret could perform sedentary work. (Doc. 6-14, p. 67). The ALJ accepted Dr. Harris's opinion that Ms. Garrett could perform sedentary exertional tasks. (Doc. 6-3, p. 25).

Dr. Harris completed a medical source statement on Ms. Garrett. (Doc. 6-14, pp. 72-78). As part of that assessment, Dr. Harris determined that, at most, Ms. Garrett could sit for three hours, stand for thirty minutes, and walk for thirty minutes—physically function for four hours only during an eight-hour period. (Doc. 6-14, p. 73). Dr. Harris found that during the remaining four hours, Ms. Garrett would "'lay around[.]'" (Doc. 6-14, p. 73). Dr. Harris based his functional conclusions on Ms. Garrett's back, hip, right knee, and foot pain but provided no narrative explanation. (Doc. 6-14, p. 74).

The ALJ gave minimal weight to Dr. Harris's medical source statement. (Doc. 6-3, p. 25).[9] The ALJ explained that crediting Dr. Harris's time limitations would preclude Ms. Garrett "from performing work at any exertional level" and would negate his conclusion that Ms. Garrett could perform sedentary work. (Doc.

---

[9] "[An] ALJ must 'state specifically the weight accorded to each item of evidence and why he reached that decision.'" *Kemp v. Astrue*, 308 Fed. Appx. 423, 426 (11th Cir. 2009) (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). Ms. Garrett argues that the ALJ did not "state the weight to be given to her own consultative examiners" (Doc. 8, p. 12), but also acknowledges that the ALJ assigned little weight to the consultative opinions from Dr. Harris and Dr. Gragg, (Doc. 8, p. 10). Ms. Garrett challenges the adequacy of ALJ's reasons for giving minimal weight to these consulting opinions. (Doc. 8, p. 10).

6-3, p. 25).  Because Dr. Harris examined Ms. Garrett only once, the ALJ did not have to defer to Dr. Harris's opinion.  *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987).  And an "ALJ  may reject any medical opinion if the evidence supports a contrary finding."  *Hickel v. Comm'r of Soc. Sec.*, 539 Fed. Appx. 980, 986 (11th Cir. 2013) (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

The ALJ reasoned that Dr. Harris's medical source statement "is not supported by [Dr. Harris's] own findings or the claimant's other treatment records." (Doc. 6-3, p. 25).  The ALJ pointed out that "there is no indication within the record of the claimant having significant restrictions in ambulation, except for a noted limp" reported by Dr. Boston in 2012 and observed by Dr. Harris in 2014.  (Doc. 6-3, p. 25).  Unrelated to Ms. Garrett's walking ability, the ALJ noted Dr. Harris limited Ms. Garrett's use of her hands to occasional reaching, handling, fingering, feeling, pushing, and pulling in the medical source statement.  (Doc. 6-3, p. 25; Doc. 6-14, p. 75).  The ALJ found that these hand limitations conflicted with Dr. Harris's conclusion that Ms. Garrett "had a normal grip and that she could pick up small items and performs various fine and gross manipulative tasks."  (Doc. 6-3, p. 25).

In reviewing Ms. Garrett's treatment records, the Court has found complaints from Ms. Garrett about her ability to walk other than limping.  Specifically, Ms. Garrett reported during an appointment with Dr. Smith in October 2013, that she (Ms. Garrett) was

still having neuropathic pain in extremities and back [and] that she thinks [it] is worsening and is now hindering her mobility . . . feels like she is walking like she is 60. Thought she initially got better on [L]yrica but now feels like she is worse again[.]

(Doc. 6-14, p. 11). Based on Ms. Garrett's complaints about migraines and "worsen[ing] neuropathic pain and gait," Dr. Smith indicated that a referral to neurology was appropriate. (Doc. 6-14, p. 12). Additionally, Dr. Smith increased the strength of Ms. Garrett's Lyrica to 150 mg (twice daily) to see if Ms. Garrett's pain improved. (Doc. 6-14, p. 12). When Ms. Garrett returned to Dr. Smith in January 2014, she still had pain but did not complain of walking or other functional difficulties, according to Dr. Smith's notes. (Doc. 6-14, p. 9).

When considering the record as a whole, substantial evidence supports the ALJ's decision to discount Dr. Harris's sitting, standing, and walking restrictions. When Dr. Harris examined Ms. Garrett, he detected tenderness in her knees. (Doc. 6-14, p. 67). Still, Dr. Harris found that Ms. Garrett's knees were stable with a full range of motion and no effusion. (Doc. 6-14, p. 67). Dr. Harris observed that Ms. Garrett did not "toe or heel walk well" and moved with a slight limp. (Doc. 6-14, p. 67). But during the same month as Dr. Harris's consultative examination, Dr. Howard reported that Ms. Garrett "show[ed] functional improvement with medication" and recorded no sitting, standing, or walking difficulties. (Doc. 6-16, p. 55).

Dr. Harris based his sitting, standing, and walking restrictions in part on Ms. Garrett's history of back, hip, knee, and foot pain.  (Doc. 6-14, pp. 67, 74).  But Ms. Garrett did not consistently complain to her providers that pain limited her ability to sit, walk, or stand.  And before Dr. Harris gave his opinion, Ms. Garrett reported to other providers that she exercised regularly and played sports.  (Doc. 6-12, p. 29; Doc. 6-14, p. 21).  The ALJ reasonably interpreted the medical record as a whole in finding that Ms. Garrett has suffered painful flareups that have restricted her ability to sit, walk, and stand periodically, but not continuously for 12 months.  Thus, substantial evidence indicates that the ALJ had good cause to discount Dr. Harris's functional opinion.

*Dr. Gragg's Opinion*

Ms. Garrett challenges the ALJ's discounting of Dr. Gragg's opinion.  (Doc. 8, p. 10).  Dr. Gragg is a licensed clinical psychologist who conducted a one-time consultative evaluation of Ms. Garrett in June 2013.  (Doc. 6-11, pp. 58-60).  Dr. Gragg diagnosed Ms. Garrett with moderate major depressive disorder.  (Doc. 6-11, p. 59); (*see also* Doc. 6-11, p. 59) ("[T]here are  indications of depressive mood but there are no indications of psychotic processes, debilitating anxiety, [or] significant vacillations in mood or mania.").  Dr. Gragg summarized that Ms. Garrett:

> did not appear to be experiencing any appreciable psychological distress, but was teary throughout the interview and is experiencing significant depression that is untreated.  At present, she likely would have difficulty functioning adequately in a work environment.  She

likely would have difficulty dealing with the rigors/stresses associated with a work environment and may have difficulty following through adequately on instructions, although she has adequate intellectual functioning to be able to understand and remember those instructions. She is somewhat socially withdrawn and may have difficulty interacting appropriately with supervisors and co-workers. Thus, it is recommended that she be afforded the opportunity to participate in psychopharmacological interventions intended to alleviate her depressive mood. If her depression can be alleviated through psychopharmacological treatment, I see no reason why she would not be able to return to the workforce in the not-too-distant future. Perhaps she should be re-evaluated in a period of three to six months after the initiation of treatment to reassess her mental status and suitability for employment at that time. It seems reasonable to believe that, if she is compliant with an effective medication regimen, she would be able to return to the workforce, physical issues notwithstanding.

(Doc. 6-11, p. 60).

The ALJ found that "Dr. Gragg's assessment does not appear consistent with the record as a whole" and gave the opinion little weight because Ms. Garrett "ha[d] not sought nor received any true mental health treatment," or "alleged any functional difficulties," and because Ms. Garrett's "other treatment records and Dr. Gragg's own findings do not indicate any significant, persistent, limitation in her ability to perform basic mental work tasks." (Doc. 6-3, pp. 21, 23). The ALJ adequately discounted Dr. Gragg's opinion for these reasons.

Ms. Garrett testified in April 2015 that she saw a counselor three or four times after Dr. Gragg diagnosed her with depression in 2013, but she maintained that the visits were not helpful. (Doc. 6-3, p. 99). Ms. Garrett was unsure whether her depression was better, worse, or unchanged since Dr. Gragg's diagnosis. (*See* Doc.

6-3, p. 99) ("I'm sorry sir, I can't answer that, I'm not sure. I mean, I hurt so much that I cry a lot. So, that's why they told me I was in depression because I cry, but like I told them I hurt a lot, so I don't know.").

Under some circumstances, a claimant's failure to seek specialized mental health treatment may not be a sufficient reason for an ALJ to discount a specialist's assessment of the claimant's mental abilities. *See Borroughs v. Massanari*, 156 F. Supp. 2d 1350, 1362 (N.D. Ga. 2001) ("[T]he fact that plaintiff does not perceive herself as depressed and has not obtained treatment from a mental health specialist is not surprising or indicative of an absence of significant illness in light of Dr. Hedeen's finding that plaintiff has poor insight into her mental condition."). But here, Dr. Gragg did not find that Ms. Garrett lacked the capacity to understand her depression diagnosis.

Regardless, Dr. Howard prescribed Celexa in October 2014 and approved doxepin in December 2014 to treat Ms. Garrett's depressive disorder. (Doc. 6-15, pp. 52, 55, 56, 49). Dr. Howard continued these prescriptions for Ms. Garrett without modification through September 2016. (Doc. 6-15, p. 60). Dr. Gragg opined that if Ms. Garrett followed "an effective medication regimen," she would be able to return to the workforce despite her depression. (Doc. 6-11, p. 60). The record does not suggest that Celexa or doxepin was ineffective at managing Ms. Garrett's depression. (*See* pp. 10-15 above). Additionally, as previously mentioned, the ALJ

did not rely exclusively upon Ms. Garrett's lack of specialized treatment when discounting Dr. Gragg's opinion.

The ALJ found that Ms. Garrett's functional report completed in April 2013 undermined Dr. Gragg's opinion. (Doc. 6-8, p. 23). According to Dr. Gragg, Ms. Garrett would have difficulties dealing with a stressful work environment, following through on instructions, being social, and interacting appropriately with supervisors and co-workers. (Doc. 6-11, p. 60). Ms. Garrett prepared a functional report less than two months before she saw Dr. Gragg and provided information that contradicts Dr. Gragg's conclusions. (Doc. 6-8, pp. 21-23). For instance, Ms. Garrett denied experiencing changes in social activities or unusual behaviors or fears. (Doc. 6-8, pp. 21, 22). Ms. Garrett reported no problems getting along with family, friends, neighbors, authority figures, and other people. (Doc. 6-8, pp. 21, 22). Ms. Garrett stated that she does not manage stress well but can handle changes in routine. (Doc. 6-8, p. 22). Ms. Garrett reported that she has no difficulties paying attention and that with repetition, she is able to follow written and verbal instructions. (Doc. 6-8, p. 21).

The ALJ noted that treatment records from Dr. Howard and other providers were inconsistent with Dr. Gragg's opinion. (Doc. 6-3, pp. 21-22). Several records dated before Ms. Garrett saw Dr. Gragg in June 2013 disclosed no mental health issues. (Doc. 6-3, pp. 21-22); (*see* Doc. 6-14, p. 28) (negative for psychiatric system

review during March 2012 appointment with general physician, Dr. Smith); (Doc. 6-14, p. 26) (describing Ms. Garrett as "[a]lert" and "[o]riented to time, place, and person" during April 2012 appointment with certified registered nurse practitioner); (Doc. 6-10, pp. 23-24, 27-28, 31-32) ("[n]o mood change, depression, or nervousness" during August, September, and October 2012 appointments with orthopedist, Dr. Boston); (Doc. 6-14, p. 22) (negative for psychiatric system review during January 2013 appointment with Dr. Smith); (Doc. 6-11, p. 8) ("[n]o feelings of hopelessness[,]" "[n]o anhedonia[,]" and negative for psychiatric system review during April 2013 appointment with general physician, Dr. Satcher); (Doc. 6-14, p. 16) ("[n]o feelings of hopelessness[,]" "[n]o anhedonia[,]" and negative for psychiatric system review during May 2013 appointment with Dr. Smith).[10]

Treatment records from providers after Dr. Gragg diagnosed Ms. Garrett's depression contradicted his assessment. (*See* Doc. 6-14, p. 14) ("[n]o feelings of hopelessness[,]" "[n]o anhedonia[,]" and negative for psychiatric system review during July 2013 appointment with general physician, Dr. Doctor); (Doc. 6-11, p. 66) (depression present, but no frequent or severe anxiety or hallucinations noted during December 2013 appointment with neurologist, Dr. Emig); (Doc. 6-11, pp.

---

[10] "Anhedonia is the inability to feel pleasure. It's a common symptom of depression as well as other mental health disorders." https://www.webmd.com/depression/what-is-anhedonia#1 (last visited Dec. 2, 2019).

66-67) (describing Ms. Garrett's attention, concentration, and mood and affect as "unremarkable" and her cognitive functioning as "[g]rossly unremarkable" during December 2013 appointment with Dr. Emig); (Doc. 6-12, p. 29) (describing Ms. Garrett as having no acute distress (NAD) during March 2014 emergency room visit with Dr. Way); (Doc. 6-12, p. 32) (noting that "[p]atient's behavior is appropriate to the current situation" during March 2014 emergency room visit with Dr. Stringfellow); (Doc. 6-14, pp. 84, 86) ("[n]o feelings of hopelessness[,]" "[n]o anhedonia[,]" and negative for psychiatric system review but assessments included depression during May 2014 appointment with Dr. Smith); (Doc. 6-15, p. 58) (describing Ms. Garrett's "[p]sychological state [as] excellent" and her "[m]ental status [as] good" during August 2014 visit with Dr. Howard).[11]

Admittedly, the providers the ALJ identified are not mental health specialists. Generally, a specialist's opinion deserves more weight than opinions from providers who do not specialize in that field. *Mills v. Astrue*, 226 Fed. Appx. 926, 930 (11th Cir. 2007); 20 C.F.R. § 404.1527(c)(2)(ii) & (5). But under the governing legal standard, multiple contradictory treatment notes from non-specialist, treating physicians about the stability of Ms. Garrett's mental health before and during the disability period constitute substantial evidence to support the ALJ's decision to

---

[11] In her discussion of Dr. Gragg's opinion, the ALJ referenced a June 2013 treatment record from Dr. Smith. (Doc. 6-3, p. 21). The Court has not been unable to locate that record.

discount Dr. Gragg's one-time consulting opinion as inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c)(4) & (6). Additionally, as the ALJ observed, Ms. Garrett challenged the first ALJ's decision to discount Dr. Gragg's opinion, but the Appeals Council did not include that issue in its remand order. (Doc. 6-3, p. 22; Doc. 6-8, p. 85; Doc. 6-4, pp. 56-57). Thus, substantial evidence supports the ALJ's evaluation of Dr. Gragg's opinion.

## V.  CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision.

**DONE** and **ORDERED** this 17th day of December, 2019.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE